**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMIRAH ALEXANDER, | ) | CASE NO. 4:18CV01512 |
| on behalf of M.A.J. | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Amirah Alexander ("Plaintiff" or "Alexander"), on behalf of her minor

daughter, M.A.J., challenges the final decision of Defendant, Nancy A. Berryhill,[1] Acting

Commissioner of Social Security ("Commissioner"), denying M.A.J.'s claim for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*

("Act"). This Court has jurisdiction[2] pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's

final decision is VACATED and REMANDED for further consideration consistent with this

opinion.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government. *See* General Order 2018-15. The stay
was thereafter extended pursuant to General Order 2019-1. As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

# I. PROCEDURAL HISTORY

In January 2016, Alexander filed an application for SSI on behalf of her daughter M.A.J., a child under the age of eighteen, alleging a disability onset date of December 29, 2015 and claiming M.A.J. was disabled due to uresus, depression, ADHD, compulsive defiant disorder, sleep apnea, and morbid obesity. (Tr. 155, 180.) The application was denied both initially and upon reconsideration. (Tr. 90, 98.) Alexander timely requested an administrative hearing. (Tr. 106.)

On September 27, 2017, an Administrative Law Judge ("ALJ") held a hearing during which M.A.J, represented by counsel, and Alexander appeared. (Tr. 35-64.) On December 28, 2017, the ALJ issued a written decision, finding M.A.J. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the listings. (Tr. 13-34.) The ALJ's decision became final on May 14, 2018, when the Appeals Council denied further review. (Tr. 1.)

On July 3, 2018, Alexander, on behalf of M.A.J., filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 14, 16, 17.) Alexander asserts the following assignments of error:

(1)     The ALJ erred in excluding material evidence from the record through misapplication of the "Five-Day Rule;"

(2)     The ALJ erred in discrediting and cherry-picking the medical opinion of Medical Expert Dr. Charles Block;

(3)     The ALJ erred in discrediting the opinions of CE Drs. Koricke and Liang; and

> (4)     The ALJ's reasoning regarding the weight he gave the opinions of the State Agency doctors, Teacher Martha Logan, and Therapists Davis and Boehme cannot be traced.

(Doc. No. 14.)

## II.   EVIDENCE

### A.     Personal Evidence

M.A.J. was born in October 2006, and was a "school-age child" at the time the application was filed and a "school-age child" on the date of the hearing, pursuant to 20 C.F.R. § 416.926a(g)(2).  (Tr. 19.)

### B.     Medical Evidence and Educational Record[3]

#### *1.       School Records*

During the 2015-2016 school year, M.A.J. was in the third grade.  (Tr. 226.)  Her report card from that school year revealed M.A.J had emerging skills in reading, writing, and math, but still required teacher support.  (*Id.*)  She displayed an understanding, but not on a consistent basis, in some areas of reading, science, and art.  (Tr. 226-227.)  Her teachers provided the following commentary for each quarter of the school year:

- 1st: [M.A.J.] adjusted nicely to third grade socially.  She is very attentive in class and works cooperatively.  Please ensure she reading daily as this will improve her comprehension, fluency and confidence.  Please encourage [M.A.J.] to practice her basic math facts.  She is putting forth effort in math.

- 2nd: [M.A.J.] is adjusting to the change of teachers well.  She is producing quality work in science.  Please ensure that she is studying her multiplication facts daily.  I am concerned that she is having difficulty. [M.A.J.] often does not complete homework and

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

needs to work on her attitude.  I feel that if she makes these adjustments she will become more proficient in math and science. [M.A.J.] is starting to put forth effort in reading class.

- 3rd: [M.A.J.] is a risk for retention.  She is having great difficulty with math concepts and could benefit from tutoring.  On days when [M.A.J.] is motivated she works extremely well.

- 4th: [M.A.J.] continued to try her best throughout the year.  There are still many areas of concern as well as need.  It would be beneficial to obtain a personal tutor for [M.A.J.] in order for her to be a successful 4th grader.

(Tr. 227.)

During the 2016-2017 school year, M.A.J. was in the fourth grade.  (Tr. 220.)  On September 15, 2016, she underwent academic testing, which revealed she was reading on a 2.4 grade level and performing math at a 2.9 grade level.  (Tr. 220-221.)  M.A.J. scored in the 10th percentile for reading and the 18th percentile for math.  (*Id.*)

In October 2016, the East Cleveland City School District created a 504 plan for M.A.J. (Tr. 218.)  The school district officials noted M.A.J.'s doctor had expressed concerns over the possibility of ADHD and her mother reported M.A.J. had excessive anger and rage.  (*Id.*)  Her teachers reported M.A.J. was struggling academically and had "gaps in her education."  (*Id.*)  M.A.J's 504 plan provided her with the following accommodations: (1) after school and Saturday tutoring; (2) a reading and math "buddy;" (3) extra time to complete assignments; (4) a weekly reading log; and (5) frequent breaks.  (*Id.*)

M.A.J's fourth grade report card revealed a mix of C and D level grades.  (Tr. 224-225.) Her teachers reported inadequate progress in reading and writing.  (Tr. 224.)  M.A.J. displayed emerging skills in math and social studies, but still required teacher support.  (Tr. 224-225.)

4

On April 13, 2017, Martha Logan, M.A.J.'s fourth grade math and science teacher, completed a teacher questionnaire using Social Security Administration form SSA-5565-BK. (Tr. 232-239.) In the domain of acquiring and using information, Ms. Logan found M.A.J dislayed slight problems in her abilities to (1) comprehend oral instructions; (2) understand school and content vocabulary; (3) understand and participate in class discussions; (4) provide organized oral explanations and adequate descriptions; (5) learn new material; and (6) recall and apply previously learned material. (Tr. 233.) She found M.A.J. had obvious problems in the areas of (1) reading and comprehending written material; (2) expressing ideas in written form; and (3) applying problem-solving skills in class discussions. (*Id*.) Ms. Logan explained her opinion as follows:

> [M.A.J.] can work independently as long as she has a clear understanding of the concept being taught. If she is not clear she does not hesitate to ask for help. In math, she struggles when basic knowledge of math facts is required because she lacks fluency. Fluency can be achieved by having daily practice at home.

(*Id*.) Ms. Logan found no problems in the domain of attending and completing tasks. (Tr. 234.) In the domain of interacting and relating with others, Ms. Logan opined M.A.J. had slight problems in her abilities to (1) play cooperatively with other children; (2) express anger appropriately; and (3) follow rules. (Tr. 235.) Ms. Logan found M.A.J. had obvious problems with respecting and obeying adults in authority. (*Id*.) She explained the basis of her decision as follows:

> [M.A.J.] can refuse to obey simple instructions (i.e., "clear your desks," "begin working now," etc.) at times. It is not always apparent to me why she refuses.

(*Id*.)  In the domain of moving about and manipulating objects, Ms. Logan found M.A.J. had a very serious problem in her abilities to (1) move her body from one place to another and (2) manage pace of physical activities or tasks.  (Tr. 236.)  She opined M.A.J had a serious problem in her ability to demonstrate strength, coordination, and dexterity and an obvious problem in her ability to move and manipulate objects.  (*Id*.)  Ms. Logan concluded M.A.J. had slight problems in her abilities to (1) show a sense of her body's location and movement in space; (2) integrate sensory input with motor output; and (3) plan, remember, and execute controlled motor movements.  (*Id*.)  Finally, in the domain of caring for herself, Ms. Logan opined M.A.J. had a very serious problem in her ability to use appropriate coping skills in the school environment and a serious problem in her ability to identify and appropriately assert emotional needs.  (Tr. 237.)  She noted obvious problems in M.A.J.'s abilities to handle frustration and respond appropriately to changes in her mood.  (*Id*.)  Ms. Logan concluded her report with the following commentary:

> [M.A.J.] is obviously too large for her age.  Because of her obesity, she has difficulty moving around and engaging in normal physical play that children her age engage in (running, jumping, etc.)

(Tr. 238.)

### 2.  *Physical Treatment Records*

A September 5, 2015 sleep study confirmed M.A.J. had sleep apnea.  (Tr. 277.)  M.A.J. followed up with pulmonologist Anna May, M.D., on September 16, 2015.  (Tr. 278.)  Dr. May observed M.A.J. was wetting her bed nightly.  (*Id*.)  M.A.J. reported she fell asleep in class during the prior school year, but was no longer doing so.  (*Id*.)  Dr. May referred M.A.J. to a renal specialist for her enuresis and hypertension and an endocrinologist for her obesity.  (Tr. 280.)

6

On May 10, 2017, M.A.J. visited pediatrician Petr Cigner, M.D. (Tr. 65.) She was 10 years old and her weight was measured at 381 pounds. (Tr. 65, 67.) Her body mass index ("BMI") was 69.25. (Tr. 67.) Dr. Cigner noted M.A.J. was continuing to gain weight and had gained 130 pounds over the past two years. (Tr. 66.) Due to this rapid weight gain, Dr. Cignar ordered testing and labwork on M.A.J.'s kidneys, thyroid, and liver. (*Id.*) The doctor also referred M.A.J. to an endocrinologist and nephrologist. (*Id.*)

That same date, Dr. Cigner filled out a form regarding M.A.J.'s abilities and limitations. (Tr. 386-387.) He noted M.A.J. had obvious problems running, jumping, climbing, and twisting. (Tr. 386.) He opined she had an obvious problem maintaining a normal pace when performing physical activities or tasks. (*Id.*) Dr. Cignar found no issues with M.A.J.'s abilities to stand, balance, shift weight, bend, kneel, crouch, walk, move and manipulate objects, demonstrate strength, coordination, and dexterity, and perform age appropriate hygiene and grooming. (*Id.*) He opined M.A.J. had a slight problem with executing controlled motor movements without pain or fatigue. (*Id.*) Dr. Cigner observed M.A.J. had "rapid weight gain leading to poor conditioning" and required "visits with endocrinology, nephrology, nutrition, and sleep medicine." (*Id.*) He concluded M.A.J. required "daily, graduated physical activity." (Tr. 387.)

### *3.*      *Mental Treatment Records*

On October 23, 2015, M.A.J. underwent a youth mental health assessment at Ohio Guidestone. (Tr. 305.) She was evaluated by therapist Erin Davis, LSW. (*Id.*) At the time of the assessment, M.A.J. was in the third grade. (*Id.*) Ms. Davis noted M.A.J. had a history of being physically and verbally aggressive towards others, was defiant, did not follow directions, and faced "expulsion last school year due to two major instances of theft from staff at school."

(*Id.*)  M.A.J. admitted she bullied others, but was a victim of bullying as well.  (*Id.*)  Ms. Davis diagnosed depressive disorder and ADHD.  (Tr. 310.)

M.A.J. visited Ohio Guidestone for medication management with nurse practitioner Lashelle Henderson, CNP, on April 5, 2016.  (Tr. 299.)  M.A.J. presented with a blunt affect and fair mood.  (*Id.*)  She was reported to be obtaining poor grades, hoarding food, frequently screaming, and refusing to bathe.  (*Id.*)  Ms. Henderson listed M.A.J.'s diagnoses as ADHD, oppositional defiant disorder, depression, enuresis, anxiety, and a learning disability.  (*Id.*)  She noted M.A.J. was on the following medications: Ddavp(a bedwetting medication), Vyvanse, Melatonin, and Zoloft.  (*Id.*)  M.A.J.'s insight, judgment, and impulse control were all improving.  (Tr. 300.)

On May 3, 2016, M.A.J. returned to Ms. Henderson with an improved mood and affect. (Tr. 293.)  Alexander, M.A.J.'s mother, indicated she did not want M.A.J. to be on medication and admitted she had not been giving M.A.J. her Zoloft.  (*Id.*)  M.A.J. reported she felt "good" on her medications and was sleeping better at night.  (*Id.*)  Overall, M.A.J. was noted to be compliant with medications, but had missed a few dosages of Zoloft.  (Tr. 378.)

During this time, M.A.J. was seeing therapist Erin Davis several times a week in an attempt to improve her social skills, learn to manage self control, improve her inattention, alleviate her depression, and boost her self esteem.  (Tr. 223.)  During these sessions, Ms. Davis and M.A.J. would discuss good social behavior and the importance of following directions at school.  (Tr. 377, 376.)  M.A.J. acknowledged her difficulty in managing her anger and self-control.  (Tr. 377.)  On May 6, 2016, M.A.J. was noted to be "rather defiant with teachers" and

was reserved during her treatment session with Ms. Davis. (Tr. 376.) However, her mother reported M.A.J. was making progress at school and at home. (Tr. 374.)

During these sessions, M.A.J. participated in art therapy and used imagery to identify her personal strengths. (Tr. 375, 372.) On June 6, 2016, M.A.J. indicated she was managing her symptoms well outside of treatment. (Tr. 370.) On July 8, 2016, Ms. Davis noted that while M.A.J.'s organization had improved, she had "difficulty managing symptoms outside of treatment particularly in the home setting." (Tr. 364.) On July 18, 2016, M.A.J. again demonstrated improved organization, but continued to have ongoing interpersonal conflicts with her siblings. (Tr. 360, 362.)

On September 2, 2016, M.A.J. was "managing symptoms [her] well." (Tr. 356.) She completed executive skill building activities "to the best of her ability" and had "some improvement in the area of organization." (Tr. 355.) M.A.J. continued to treat with Ms. Davis on a regular basis, and they would discuss her strengths, engage in positive self talk, and play during their sessions. (Tr. 353, 352, 351.) Ms. Davis observed M.A.J.'s attention span was improving. (Tr. 351, 350.)

M.A.J. renewed her treatment plan with Ms. Davis on October 24, 2016. (Tr. 342.) At that time, M.A.J. required improvement in the areas of impulse control, attention span, interpersonal conflicts, and depression. (*Id*.) On October 25, 2016, M.A.J. acted defiantly towards Ms. Davis and required a "time out to review appropriate behaviors." (Tr. 339.) On October 28, 2016, M.A.J. and Ms. Davis discussed "socially appropriate behaviors and communication" and M.A.J. was "mostly attentive and engaged." (Tr. 338.)

M.A.J. reported being bulled at school on November 15, 2016. (Tr. 335.) Her and Ms. Davis engaged in positive self talk and problem solving to deal with this issue. (*Id.*) She continued to see Ms. Davis a few times a week, and Ms. Davis noted improvement in the areas of attention and organization. (Tr. 334, 333.)

On December 1, 2016, M.A.J. was taken to the emergency room after reporting suicidal ideation. (Tr. 320.) She indicated she had been bullied for the past year, but it had worsened over the past five weeks due to gaining 35 pounds. (*Id.*) She relayed she was called "ugly" and "fat" on a regular basis. (*Id.*) M.A.J. reported daily suicidal ideation after an incident a week prior in which several students called her names and afterwards she "thought about how things would be better if she were dead." (*Id.*) M.A.J.'s mother relayed M.A.J. had been off of medications for three weeks due to a change in psychiatrist at Ohio Guidestone. (*Id.*) During her emergency room visit, M.A.J. expressed a passive wish to die, but did not meet the criteria for a hospital admission. (Tr. 321.) She was discharged with instructions to follow up with her psychiatrist, counselor, and pediatrician. (*Id.*)

Following her emergency room visit, M.A.J. continued to see Ms. Davis 2-3 times a week for therapy. (Tr. 332, 331, 330, 329.) On December 27, 2016, M.A.J. verbalized "a willingness to take steps towards improvement [in] interacting with others within the family setting." (Tr. 327.) On January 10, 2017, M.A.J. was "found being defiant" as she was "sleeping in class." (Tr. 325.) Ms. Davis felt M.A.J was "not a current risk for self harm" and had "some improved organization." (*Id.*)

During her sessions with Ms. Davis, M.A.J. expressed a desire to complete her assignments on time and use art as a coping mechanism. (Tr. 324, 418.) On February 10, 2017,

M.A.J. admitted she had an ongoing conflict with a teachers' aide, but was able to "verbalize examples of appropriate behavior." (Tr. 417.) On February 23, 2017, M.A.J. struggled to maintain attention during her therapy session, but demonstrated some organizational skills. (Tr. 414.) On March 1, 2017, M.A.J. was mostly "attentive though she [did] not acknowledge her responsibility with her poor decision making in the community setting." (Tr. 413.)

On March 24, 2017, M.A.J. admitted she had been accused of pushing and hitting a peer. (Tr. 411.) She reported the peer was "saying mean things about her and her mom." (*Id.*) M.A.J. was initially defiant with discussing this with Ms. Davis, but she eventually "relaxed and verbalized her understanding of why and how she can avoid inappropriate behaviors and escalating conflicts." (*Id.*) M.A.J. and Ms. Davis continued to discuss respectful behavior in later sessions and Ms. Davis noted improved attention and planning ability. (Tr. 409, 410, 408.)

M.A.J. was again defiant during her April 26, 2017 session with Ms. Davis. (Tr. 407.) However, she was "willing to apply suggestions for appropriate communication/behaviors." (*Id.*) During her May 5, 2017 session, she was attentive and engaged. (Tr. 406.)

On May 6, 2017, M.A.J. visited Ohio Guidestone for medication management with nurse practitioner Lashelle Henderson, CNP. (Tr. 400.) She displayed an improved affect and mood. (*Id.*) M.A.J. indicated she was feeling better, school was going well, but she was still wetting the bed. (*Id.*) Ms. Henderson listed M.A.J.'s medications as Ddavp, Vyvanse, Melatonin, and Zoloft. (*Id.*) She assigned M.A.J. a Global Assessment of Functioning[4] ("GAF") score of 55.

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of

(Tr. 401.)  M.A.J. was observed to have a blunt affect, but no suicidal ideation, improving insight and judgment, and intact attention.  (*Id.*)

During M.A.J.'s May 8, 2017 session with Ms. Davis, she was "somewhat defiant" and "slow to participate."  (Tr. 399.)  M.A.J. was "not willing to disclose what triggered her" and struggled to "acknowledge her role in communicating effectively" with adults.  (*Id.*)  On May 23, 2017, Ms. Davis noted M.A.J. was "aware of some strengths," but "had to be coached through most of the session to bring out her awareness."  (Tr. 398.)  However, during her May 31, 2017 session, M.A.J. was attentive, engaged, and looking forward to summer break.  (Tr. 397.)

M.A.J. continued regular therapy sessions with Ms. Davis throughout the summer.  She indicated she was making an effort in managing her behaviors and emotions.  (Tr. 395, 391, 388.)

On June 5, 2017, Ms. Davis filled out a form regarding M.A.J.'s abilities and limitations. (Tr. 435-436.)  She found M.A.J. had no problems in the following areas:

- relating experiences and telling stories;

- taking turns in a conversation;

- interpreting meanings of facial expressions, body language, hints, sarcasm;

- carrying out single-step instructions;

- waiting to take turns;

- cooperating in/being responsible for taking medications; and

- using good judgment regarding personal safety and dangerous circumstances.

(*Id.*)  Ms. Davis found M.A.J. displayed slight problems in the following areas:

---

clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

- comprehending oral instructions;

- seeking attention appropriately;

- asking permission appropriately;

- following rules;

- introducing and maintaining relevant and appropriate topics of conversation;

- paying attention when spoken to directly;

- focusing long enough to finish assigned activities or tasks;

- carrying out multi-step instructions;

- changing from one activity to another; and

- being patient when necessary.

(*Id.*) Ms. Davis concluded M.A.J. had obvious problems in the following areas:

- applying problem-solving skills;

- playing cooperatively with other children;

- making and keeping friends;

- expressing anger appropriately;

- respecting/obeying adults in authority;

- sustaining attention during activities;

- refocusing to task;

- working without distracting self or others;

- working at reasonable pace/finishing on time;

- handling frustration appropriately;

- taking care of personal hygiene;

13

- identifying and appropriately asserting emotional needs;

- using appropriate coping skills; and

- knowing when to ask for help.

(*Id.*)

On June 16, 2017, Ms. Davis noted M.A.J. was managing well in the home setting and was optimistic about her short-term future. (Tr. 388.) M.A.J. was making an effort to cope with her emotions appropriately and Ms. Davis noted improved attention. (Tr. 388, 390.)

M.A.J. visited nurse practitioner Lashelle Henderson at Ohio Guidestone on July 8, 2017. (Tr. 427, 425.) Ms. Henderson noted M.A.J. had an improved mood and was compliant with her medication. (Tr. 427.) She assigned M.A.J. a GAF score of 55. (*Id.*) M.A.J.'s mother indicated she was happy with the results of treatment. (*Id.*) However, M.A.J. continued to have difficulty sleeping at night. (*Id.*) She presented with a blunted affect and her hygiene was "very poor" upon examination. (Tr. 425.)

## C.     State Agency Reports

On February 27, 2016, M.A.J. underwent a consultative examination with psychologist Deborah Koricke, Ph.D. (Tr. 281-287.) Alexander accompanied M.A.J. during the evaluation and provided Dr. Koricke with background information. (Tr. 281.) She reported M.A.J. "falls often due to losing her balance related to being overweight." (Tr. 282.) She relayed M.A.J. had been obtaining special education services since the first grade and has been suspended from school for fighting others. (*Id.*) M.A.J. confirmed she was depressed, cried often, and had poor sleep. (Tr. 283.)

On examination, M.A.J. was tense, nervous, and anxious. (Tr. 284.) Her affect was flat and blunted and she spoke softly. (*Id.*) She endorsed symptoms consistent with depression, but denied any hallucinations or paranoia. (*Id.*) Dr. Koricke administered the WISC-IV and M.A.J. obtained a full scale IQ of 93, placing her in the average range. (Tr. 285.) Her working memory score fell in the low average range and her perceptual reasoning and processing speed scores were in the average range. (Tr. 285-286.)

Based upon this evaluation, Dr. Koricke diagnosed depressive disorder and oppositional defiant disorder. (Tr. 286.) Dr. Koricke provided the following opinion regarding M.A.J.:

**1. Describe the claimant's abilities and limitations in acquiring and using information relative to the functioning of typically-developing children of the same age.**

[M.A.J.] did show some mild to moderate problems with attention in this one-on-one situation which are perceived to be related to difficulties with her depression. She understood simple or one-step instructions and had no difficulties with complex or multistep instructions. Cognitively, she is functioning in the average range of intellectual functioning which hamper her abilities in this area. Mother reported she has been diagnosed with learning disabilities which could not be confirmed by the evaluation today. This would negatively impact her abilities in this area.

**2. Describe the claimant's abilities and limitations in attending to and completing tasks relative to the functioning of typically developing children of the same age.**

In this one-on-one situation, [M.A.J.] showed difficulty with maintaining her focus and attention related to her issues with depression. Her difficulties maintaining her focus as well as problems with her frustration and depressive symptoms will negatively impact her ability in this area. She is likely to have difficulty working with peers in a group situation because she is distracted due to being tense and depressed.

**3. Describe the claimant's abilities and limitations in interacting and relating with others relative to the functioning of typically-developing children of the same age.**

15

[M.A.J.'s] mother reports she has friends, but there are times when she isolates herself because she is easily frustrated and agitated when around other people. During the examination, [M.A.J.] put forth consistently good effort to interact, but she was passive, depressed, and tense. She remained polite and cooperative here, but has a history of being unable to interact, even attend school, due to her acting out and has an inability to sustain herself over the course of her school days.

**4. Describe the claimant's abilities and limitations in self-care relative to the functioning of typically-children of the same age.**

[M.A.J.] can complete self-care activities independently, but she requires reminders to do chores. She is independent in toileting. She shows low frustration tolerance and mother states that she has emotional or oppositional outbursts. She appears to have difficulty managing her anger as well as her depression which negatively impact her energy and motivation for self-care.

(Tr. 286-287.)

On March 23, 2016, M.A.J. underwent a physical consultative examination with pediatrician James T. Liang, M.D. (Tr. 289.) Dr. Liang observed due "to her severe obesity [M.A.J.] cannot walk for far distances, and only for about three blocks without tiring. She walks slowly, cannot run, and cannot join sports teams." (*Id.*) On examination, M.A.J. was 60 inches tall and weighed 304 pounds, resulting in a body mass index ("BMI") of 61. (Tr. 290.) Her gait was normal and she had no edema. (Tr. 291.) Her balance and coordination were also normal. (*Id.*) Dr. Liang diagnosed severe obesity, sleep apnea, depression, and oppositional defiant disorder. (*Id.*) He provided the following discussion:

The child is a nine year old female with a history of severe obesity. Her BMI is 61. Currently she cannot walk for far distances, walks slowly, cannot run, and cannot join sports teams due to this concern. She also has sleep apnea where she has needed CPAP and oxygen in the past, but she is not currently on CPAP. She also has depression where she attends counseling at Guidestone, but she reports that it does not really help her symptoms. She also has been diagnosed with ODD where she fights with others.

16

(Tr. 291.)

In April 2016, state agency psychologist Cynthia Waggoner, Psy.D., and state agency physician Uma Gupta, M.D., reviewed M.A.J.'s records and completed a Childhood Disability Evaluation. (Tr. 74-75.) They found M.A.J. had a less than marked limitation in the domains of Attending and Completing Tasks, Interacting and Relating With Others, Moving About and Manipulating Objects, Caring For Yourself, and Health and Physical Well-Being. (*Id*.) They concluded M.A.J. had no limitation in the remaining domain of Acquiring and Using Information. (*Id*.)

In May 2016, state agency psychologist Leslie Rudy, Ph.D., and state agency physician Obiaghanwa Ugbana, M.D., reviewed M.A.J.'s records and completed a Childhood Disability Evaluation. (Tr. 84-85.) They affirmed the findings of Drs. Waggoner and Gupta. (*Id*.)

**D.  Hearing Testimony**

During the September 27, 2017 hearing, M.A.J.'s counsel and the ALJ had the following exchange regarding certain evidence being admitted into the record:

Atty:  I do, Your Honor, but I thought that there actually should be a 12F.

ALJ:  I have 11F without anything following after that.

Atty:  Yes, there were records submitted from Rainbow Baby's University Hospital, 9/22.

ALJ:  Okay, I do see, this was filed 9/22/17, four pages. What's in those records by the way?

Atty:  It's an up-to-date physical appointment and it shows like her current weight and things like that to update things.

ALJ:  Anything new in there that has not, that we're not aware of, any new diagnoses, anything besides just the weight?

17

Atty:     Not a new diagnosis but an 80 weight gain.

ALJ:      Okay.  Over what period of time?

Atty:     From her, we had a weight from, about a year and a half.

ALJ:      I'll see what I'll do with that record but if that's all that's in there
          then that's, I don't think we have to worry too much about it but I
          just wanted to make sure the doctor hears what's in the records.

(Tr. 38-39.)

M.A.J. testified to the following:

• She is ten years old.  (Tr. 41.)  She is in the fifth grade.  (*Id.*)

• She has friends at school.  (Tr. 43.)  She eats lunch, does homework, and plays
  with them.  (*Id.*)  She plays outside with her friends.  (*Id.*)  She does not see her
  friends outside of school.  (*Id.*)

• She likes school.  (Tr. 44.)  Her favorite class is reading.  (*Id.*)  She has
  difficulties with math, social studies, and reading.  (Tr. 45.)  She is able to do her
  homework on her own.  (*Id.*)

• She argues with some of the other students at school.  (Tr. 47.)  She gets along
  with her teachers.  (Tr. 48.)  She has not gotten into trouble this school year, but
  she did get into trouble about five times during the prior school year.  (*Id.*)  She
  would use the bathroom and leave class without permission, not complete her
  work, and was disrespectful to adults.  (Tr. 49.)

• She is able to pick out her own clothing, dress herself, and attend to personal
  hygiene.  (Tr. 50.)  Her mother wakes her up in the morning.  (*Id.*)  She takes
  medications daily.  (Tr. 51.)

Alexander testified to the following regarding M.A.J.:

• She is four feet eleven inches tall.  (Tr. 52.)  She weighs 381 pounds.  (*Id.*)
  Alexander believes the weight issue is genetic, as M.A.J.'s father is over 500
  pounds.  (Tr. 53.)

• She suffers from depression and is bullied.  (*Id.*)  She takes medications to calm
  her, help her focus, sleep, and prevent bed wetting.  (*Id.*)  She continues to
  struggle with bed wetting, despite her medications.  (Tr. 54.)

18

- She has temper tantrums. (*Id.*) She argues with her siblings frequently. (Tr. 57.) She was diagnosed with ADHD. (Tr. 55.)

- She does not have an IEP, but she does have a 504 plan in school. (Tr. 54.) Under the 504 plan, she attends therapy three times a week and has a smaller class size for reading. (Tr. 54-55.) She gets extra time for reading and math. (Tr. 55.)

- She is able to take care of her own personal needs, such as bathing and toileting, but requires "a lot of redirecting." (Tr. 56.) Alexander attempts to get her to walk a few blocks for exercise. (Tr. 57.)

- She has a few friends and enjoys drawing. (Tr. 57.) She is "not a happy child." (Tr. 58.) Her mood has improved on medications, but she still has temper tantrums. (*Id.*) Several months ago, she was "in the psych ward" because of suicidal ideation. (*Id.*) She tends to socially isolate herself. (Tr. 59.)

The medical expert ("ME"), Charles R. Block, M.D., testified to the following:

- He was interested in the "most recent University Hospital evaluation of her" which was not contained in the list of exhibits. (Tr. 61.) The ALJ read portions of this recent treatment note into the record for Dr. Block to hear. (*Id.*)

- Her morbid obesity is her most significant impairment and it is "at such a degree that one would anticipate significant affects upon her life expectancy." (Tr. 62.) She also has a mood disorder, academic skill issues, and oppositional defiant disorder. (*Id.*)

- She does not meet Listing 112.04 for her depression. (*Id.*)

- She is less than marked in the following domains: gathering and using information, staying on task, moving about and manipulating objects, and caring for self. (Tr. 62-63.) She has marked restrictions in inter-relating with others and health and physical well-being. (*Id.*)

- She is marked in the domain of physical well-being "because of the severity of her obesity and my anticipating that she needs aggressive evaluation with that much weight she probably has non-alcoholic hepatic steatosis. She needs aggressive treatment." (Tr. 63.)

### III.   STANDARD FOR DISABILITY

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act. "An individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S .C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). To

receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." 20 C.F.R. § 416.926a(e)(3)(I). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on October **, 2006. Therefore, she was a school-age child on December 29, 2015, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since December 29, 2015, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: morbid obesity, depression, and oppositional defiant disorder (20 CFR 416.924(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.      The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.      The claimant has not been disabled, as defined in the Social Security Act, since December 29, 2015, the date the application was filed (20 CFR 416.924(a)).

(Tr. 19-29.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Admission of Evidence

In her first assignment of error, Plaintiff contends the "ALJ misapplied the rules regarding the submission of evidence." (Doc. No. 14 at 16.) Plaintiff asserts M.A.J.'s counsel informed the ALJ twenty-one days prior to the hearing that there were outstanding medical records from University Hospitals and these records were submitted to the ALJ five days prior to the hearing. (*Id*. at 17.) She contends that despite this being done in compliance with the Social Security Administration's regulations and policies regarding the submission of evidence, the "ALJ spoke about these records at the hearing and in his Decision as if the above statutes and regulations were not complied with." (*Id*.) Plaintiff maintains that since the evidence submission requirements "were fully complied with" the ALJ "erred in failing to admit them into the record." (*Id*.) She asserts this was not harmless error, as (1) "an ALJ that fails to fully develop the record effectively denies a claimant of a full and fair hearing" and (2) "it cannot be known whether admission of this evidence into the record and full review of it by the ALJ and Medical Expert Dr. Block would have resulted in a finding of an extreme limitation in the health and physical well-being functional domain," which would have supported a finding of disability. (Doc. No. 17 at 5-6.)

The Commissioner maintains the ALJ "reasonably declined to admit into evidence a treatment note from University Hospital because it was submitted less than five business days before" the hearing. (Doc. No. 16 at 1.) The Commissioner argues even "if the ALJ had erred in excluding the evidence from the record, any error was harmless because the ALJ read the treatment note to the medical expert at the hearing." (*Id.* at 2.) Finally, the Commissioner asserts Alexander "has failed to show that the treatment note showed the claimant had greater limitation than found by the ALJ." (*Id.*)

In December 2016, the Social Security Administration promulgated new regulations regarding the submission of written evidence to an ALJ at the hearing level. *Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process*, 81 Fed Reg. 90987-01 (Dec. 16, 2016)(to be codified at 20 CFR Parts 404, 405, and 416). These new regulations contained a "5-Day Requirement," in which a claimant would need to either provide or inform the ALJ of outstanding evidence five business days prior to the scheduled hearing. *Id.* This requirement was created in an effort to promote "the efficiency of [Social Security's] hearing process and allow[] it to work more effectively by ensuring that ALJs have a more complete evidentiary record when they hold hearings." *Id.* This regulation provides, in relevant part:

> (a) When you submit your request for hearing, you should also submit information or evidence as required by § 416.912 or any summary of the evidence to the administrative law judge. Each party must make every effort to ensure that the administrative law judge receives all of the evidence and must inform us about or submit any written evidence, as required in § 416.912, no later than 5 business days before the date of the scheduled hearing. If you do not comply with this requirement, the administrative law judge may decline to consider or obtain the evidence unless the circumstances described in paragraph (b) of this section apply.

20 CFR §416.1435(a). This regulation was effective beginning January 17, 2017, but compliance was not required[5] until May 1, 2017. 81 Fed Reg. 90987-01 (Dec. 16, 2016).

Following the implementation of this regulation, the Social Security Administration issued Social Security Ruling ("SSR") 17-4p, which reiterated the "5-Day Requirement" as follows:

> At the hearings level, a claimant generally must submit or inform us about written evidence at least 5 business days before the date of his or her scheduled hearing. We adopted this 5-day requirement in December 2016 and implemented it in May 2017, to address unprecedented workload challenges.

SSR 17-4p, 2017 WL 4736894, *2 (S.S.A. Oct. 4, 2017). The Social Security Administration also has a similar rule contained within its Hearings, Appeals, and Litigation Law ("HALLEX") manual. *See* HALLEX I-2-6-58(S.S.A.), 1993 WL 643036 (May 1, 2017); HALLEX I-2-5-13 (S.S.A.), 2015 WL 1735348 (May 1, 2017). HALLEX is a procedural manual which sets forth the safeguards and procedures for the Administrative Law Judge hearings. *Robinson v. Barnhart*, 124 Fed. App'x 405, 410 (6th Cir. 2005).

Here, the evidence at issue is a May 10, 2017 office visit[6] with pediatrician Petr Cignar, M.D., at University Hospitals. (Tr. 65-67.) A review of the administrative record confirms

---

[5] As M.A.J.'s hearing occurred on September 27, 2017, compliance with this regulation was required at the time of her hearing. (Tr. 16.)

[6] This treatment note contains the following information: On May 10, 2017, M.A.J. visited pediatrician Petr Cigner, M.D. (Tr. 65.) She was 10 years old and her weight was measured at 381 pounds. (Tr. 65, 67.) Her body mass index ("BMI") was 69. (Tr. 67.) Dr. Cigner noted M.A.J. was continuing to gain weight and had gained 130 pounds over the past two years. (Tr. 66.) Due to this rapid weight gain, Dr. Cignar ordered testing and labwork on M.A.J.'s kidneys, thyroids, and liver. (*Id.*) The doctor also referred M.A.J. to an endocrinologist and nephrologist. (*Id.*)

M.A.J., through counsel, informed the ALJ that this medical record remained outstanding on September 6, 2017, twenty-one days prior to the September 27, 2017 hearing. (Tr. 269.) M.A.J.'s counsel eventually obtained this treatment record and submitted it to the ALJ on September 22, 2017. (Tr. 38.) During the hearing, M.A.J.'s counsel noted this treatment record was not listed as an exhibit, and the ALJ responded he would "see what [he will] do with that record." (Tr. 39.)

In the decision, the ALJ declined to admit this treatment note as an exhibit, explaining as follows:

> The claimant submitted or informed the Administrative Law Judge about additional written evidence less than five business days before the scheduled hearing date. I decline to admit this evidence because the requirements of 20 CFR 416.1435(b) are not met. As I will discuss, although Counsel's brief notified me that she was waiting on outstanding records from UH that were received as of the hearing date, I have declined to admit that one treatment from May 2017 into the record because it has not otherwise met the exceptions for evidence received less than 5 days before the hearing. I did, however, read that note into the hearing transcript, so Dr. Block would have an opportunity to consider it.

(Tr. 16.) The ALJ again referenced this May 2017 treatment note later in the decision, when discussing the domain of health and physical well-being:

> Although I decline to admit a treatment note from May 2017, I read the note into the record for Dr. Block's consideration. I note that this treatment note provides nothing new and only bolsters evidence that the claimant's worsening obesity has the potential to cause many physical issues, such as diabetes, liver, and kidney issues, but there is no evidence at this time to establish an extreme limitation from her obesity on her health and physical well-being.

(Tr. 29.)

The Court finds the ALJ did not properly apply 20 CFR §416.1435 and erred in not admitting the May 10, 2017 treatment note from Dr. Cignar. As discussed *supra*, 20 CFR §416.1435(a) requires a claimant to *inform* or submit any written evidence to the ALJ no later than 5 business days before the date of the scheduled hearing. 20 CFR §416.1435(a). Here, M.A.J.'s counsel complied with this requirement, informing[7] the ALJ of the outstanding medical evidence nearly three weeks prior to the hearing. (Tr. 269.) Thus, under the Social Security Administration's own regulations and policies, the ALJ should have admitted this treatment note into evidence. *See* HALLEX I-2-5-13 ("If a claimant or appointed representative informs SSA about evidence no later than five business days before the scheduled hearing date . . . the ALJ *will accept and consider the evidence* when it is received.")(emphasis added). *See also* HALLEX I-2-6-58 ("If a claimant or appointed representative informs an ALJ about evidence at least five business days before the date of the scheduled hearing, but does not submit the evidence at least five business days before the date of the scheduled hearing, the ALJ will . . . consider the evidence *regardless of whether the circumstances in 20 CFR 404.935(b) and 416.1435(b) apply*.")(emphasis added.).

The ALJ acknowledged M.A.J's counsel notified him of the outstanding medical records, but declined to admit the treatment note because it was "received less than 5 days before the hearing." (Tr. 16.) However, this is a misapplication of 20 CFR §416.1435. The requirement is not that all outstanding medical records be submitted five business days prior to

---

[7]    The Commissioner, in her Brief on the Merits, ignores the fact that M.A.J.'s counsel informed the ALJ of this treatment note twenty-one days prior to the scheduled hearing, instead focusing on when the evidence was actually submitted. (*See* Doc. No. 16 at 9.)

the hearing, but that the ALJ is either *informed of* or in receipt of these records five business days prior to the hearing. *See* 20 CFR §416.1435(a).

When the Social Security Administration does not follow its own regulations, "reversal is required unless the legal error is harmless." *Wagner v. Comm'r of Soc. Sec.*, 2018 WL 1449150, *8 (N.D. Ohio Mar. 23. 2018). Indeed, even if an ALJ decision is supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746. *See also Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 822 (N.D. Ohio Sept. 28, 2009)("Because the ALJ failed to follow procedural regulations designed to protect Winning, this Court reverses the ALJ's decision.").

Here, the ALJ's error was not harmless. The ALJ improperly excluded this treatment note from the record, despite the fact Dr. Block, the medical expert at the hearing, indicated he was "interested in the most recent University Hospital evaluation of her." (Tr. 61.) The ALJ then read a portion of the treatment note to Dr. Block, but Dr. Block did not have the opportunity to review the treatment note himself. (*Id.*) Dr. Block then testified M.A.J.'s morbid obesity was her most significant impairment and it was "at such a degree that one would anticipate significant affects upon her life expectancy." (Tr. 62.) Dr. Block further found M.A.J. was marked in the domain of health and physical well being, "because of the severity of her obesity" and the likelihood she would need "aggressive evaluation with that much weight" and have "non-alcoholic hepatic steatosis." (Tr. 63.)

Given that this excluded treatment note primarily dealt with M.A.J.'s obesity and Dr. Block felt M.A.J's obesity was so severe as to impact her life expectancy, it is entirely possible if

Dr. Block had actually reviewed the treatment note, he would have found an extreme limitation in the domain of health and physical well-being. A finding of an extreme limitation in one domain results in a conclusion a child functionally equals the listings and is disabled. *See* 20 C.F.R. § 416.926a(d) ("If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled."). Thus, the exclusion of this important treatment note cannot constitute harmless error. *See McLean v. Comm'r of Soc. Sec.*, 360 F.Supp.2d 864, 872 (E.D.Mich.2005) ("The error is not harmless when the reviewing court is hampered by the lack of explanation and the rejected evidence could very well establish disability, as here.").

The Commissioner argues because "the ALJ read the medical note into the hearing transcript, so that the medical expert Dr. Block could consider it," it was harmless error. (Doc. No. 16 at 9.) Indeed, the ALJ did read portions of this treatment note into the record, despite concluding it "provide[d] nothing new" and "only bolster[ed]" the already existing evidence. (*See* Tr. 29, 61.) However, the ALJ only read the narrative portion of the treatment note into the record. (Tr. 61.) He did not read the types of exact labwork and diagnostic tests M.A.J.'s physician had ordered, nor did he read M.A.J.'s vital signs, including her blood pressure, height, weight, percentile, or body mass index. (Tr. 61, 66-67.) The ALJ is not a medical professional and his decision to cherry pick portions of a treatment note for Dr. Block to review and base his testimony upon is not appropriate.

In sum, the ALJ failed to comply with the Social Security Administration's own regulations regarding the admission of evidence and his failure to comply with these regulations

does not constitute harmless error.[8]  Accordingly, the Court finds remand is necessary, thereby affording the ALJ an opportunity to admit this properly-submitted treatment note into the record and consider it when reaching his decision.

**B.     Medical Expert Testimony**

Plaintiff next argues the ALJ improperly evaluated the opinion of Dr. Block, the medical expert ("ME") at the hearing.  (Doc. No. 14 at 19.)  She asserts the ALJ "cherry-picked" Dr. Block's opinion, using "Dr. Block's testimony as 'bolstering evidence only' where he deemed appropriate."  (*Id.* at 20.)  With respect to the domain of interacting and relating with others, Plaintiff contends the "ALJ formed his own medical opinion that M.A.J's limitations had improved with treatment and fit Dr. Block's medical opinion around it."  (*Id.*)

The Commissioner maintains the ALJ's findings in each of the six domains are supported by substantial evidence.  (Doc. No. 16 at 10-18.)  The Commissioner asserts "the ALJ was not required to agree with all of Dr. Block's opinions in their entirety."  (*Id.* at 13.)  She argues the ALJ "properly discounted Dr. Block's opinion finding marked limitations in interrelating with others" because Dr. Block "gave no evidentiary support for his finding" and his testimony "was inconsistent with the evidence as a whole."  (*Id.* at 13-14.)  The Commissioner

---

[8]     In addition to prejudicing M.A.J. on the merits, the ALJ also deprived her of her substantial right to a full and fair hearing.  Indeed, under 20 C.F.R. § 416.912(b)(ii), the Social Security Administration has the duty to develop the complete medical history of the individual, which includes medical history for at least twelve months preceding the application and the alleged onset date. In failing to fully and fairly develop the record by excluding this properly-submitted treatment note, the ALJ violated his duty and deprived M.A.J. of her substantial right to a full and fair hearing.  *See generally Bennett v. Colvin*, 2016 WL 308777 (N.D. Ohio Jan. 26, 2016); *Morgan v. Astrue*, 2011 WL 1235206 (S.D. Ohio Mar. 9, 2011).

notes the ALJ "also noted that the record showed the claimant's mother was not administering M.A.J.'s psychotropic medication consistently, and there was a gap in any pharmacology follow-up visits for one year in 2016." (*Id.* at 14.)

An ALJ can properly rely on the testimony of a non-examining medical expert in order to make sense of the record. *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001); *Dalton v. Colvin*, 2014 WL 301443 at * 6 (S.D. Ohio Jan. 28, 2014), *report and recommendation adopted*, 2014 WL 661597 (S.D. Ohio Feb. 19, 2014). An ALJ's reliance on the opinion of a non-examining medical expert is proper if the expert's opinion is based on objective reports and opinions. *See Barker v. Shalala*, 40 F.3d 789, 794–95 (6th Cir. 1994); *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1308–09 (6th Cir. 1990); *Majors v. Colvin*, 2014 WL 1238477 at * 6 (N.D. Ohio March 25, 2014).

However, ALJs "are not required to adopt any prior administrative medical findings" made by State agency medical or psychological consultants, or other program physicians or psychologists. 20 C.F.R. § 404.1513a(b)(1). *See also* 20 C.F.R § 404.1527(e).[9] Because "Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation," ALJs must consider their findings and opinions. *Id.* When doing so, an ALJ will evaluate the findings using the relevant factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertises, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any

---

[9]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

other factors relevant to the weighing of the opinions. 20 C.F.R. § 404.1513a(b)(2). Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight. *See* 20 C.F.R § 404.1527(e).

During the September 27, 2017 hearing, Dr. Block, the ME, testified M.A.J. was less than marked in the following domains: gathering and using information, staying on task, moving about and manipulating objects, and caring for self. (Tr. 62-63.) Dr. Block found marked restrictions in the domains of inter-relating with others and health and physical well-being. (*Id.*) Because Dr. Block concluded M.A.J. was "marked" in two domains, he found M.A.J. functionally equaled the listings and was disabled. *See* 20 C.F.R. § 416.926a(d) ("If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled.").

In the decision, the ALJ evaluated Dr. Block's opinion as follows:

> I give partial weight to Dr. Block's impartial medical expert testimony because his testimony regarding the nature of the claimant's allegations are established in the record, but I find that his functional domain assessment was too conclusory. I have used his testimony as bolstering evidence only where appropriate in this decision, relying predominantly on my review of the totality of the evidence as a whole.

(Tr. 22.) The ALJ then found M.A.J. was less than marked in the following domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; and (5) caring for yourself. (Tr. 23-27.) He concluded M.A.J. had marked limitations in the domain of health and physical well-being. (Tr. 29.) As the ALJ's conclusion deviated from Dr. Block's testimony regarding interacting and

relating with others, the ALJ provided further discussion regarding Dr. Block's opinion when

evaluating this domain:

> Dr. Block testified that the claimant's mental impairments caused marked limitations in interacting and relating with others, but he provided no evidentiary support for his findings.
>
> I note that the claimant had a history of stealing at home and at school, she had a history of "frequent outbursts," she was "verbally and physically aggressive to others," she was the victim of bullying due to her weight, and she was suspended for fighting. (Ex. 2F, p. 2). I note, however, that Ms. Alexander was not administering the claimant's psychotropic medication consistently and there was a gap in any pharmacology follow-up visits for one year in 2016 (Ex. 9F, p. 6). Contrary to Dr. Block's opinion that the claimant's mental impairments caused her marked limitations in this domain, I find that the claimant was receiving ongoing counseling services at her school for emotional disturbance and oppositional defiant disorder, resulting in gradual improvement in the claimant's ability to interact with others at home, and in the public, such as a restaurant setting (Ex. 6F, pp. 29, 30, 34, 35, 42, 52, 53, 54, 55). Moreover, once the claimant's mother re-established the claimant's pharmaceutical appointments after a one-year gap, the claimant's mood improved significantly (Ex. 9F, p. 6). For these reasons, I give less weight to this portion of Dr. Block's testimony, as it is [in]consistent with the medical evidence as a whole.
>
> Accordingly, I find that the inconsistently-managed effects of the claimant's depression and oppositional defiant disorder have imposed less than marked limitations in interacting and relating with others.

(Tr. 26.)

The Court finds the ALJ's evaluation of Dr. Block's opinion[10] was not supported by substantial evidence. As an initial matter, many of M.A.J.'s behaviors listed by the ALJ do not support his reasoning for discrediting Dr. Block's testimony. The ALJ stated M.A.J. had a history of stealing at home and school, was verbally and physically aggressive towards others, had "frequent outbursts," was bullied by others, and was suspended from school for fighting. (Tr. 26.) These facts support Dr. Block's conclusion M.A.J. had marked limitations in the domain[11] of interacting and relating with others. *See Hutchinson v. Comm'r of Soc*. Sec., 2016 WL 7414532, *15 (N.D. Ohio Nov. 21, 2016), *report and recommendation adopted*, 2016 WL 7407496 (N.D. Ohio Dec. 21, 2016).

The ALJ further explained M.A.J.'s psychiatric impairments were "inconsistently managed," noting her mother did not administer M.A.J.'s medication on a consistent basis and there was a year gap "in any pharmacology follow-up visits" in 2016. (Tr. 26.) This reasoning is

---

[10] The Court notes the ALJ adopted the findings of Dr. Block as to five of the six domains — acquiring and using information, attending and completing tasks, moving about and manipulating objects, caring for yourself, and health and physical well-being. (Tr. 23-29.) Because these findings are consistent with Dr. Block's testimony they need not be addressed in evaluating the ALJ's weighing of Dr. Block's opinion. The ALJ's findings do conflict, however, with Dr. Block's opinion as to the domain of interacting and relating with others. Specifically, Dr. Block concluded M.A.J. had marked limitations in this domain, while the ALJ found she had less than marked limitations. (Tr. 26, 62-63.)

[11] Examples of limitations in this domain include, but are not limited to (1) not reaching out to be picked up or held by caregiver; (2) no close friends, or all friends are older or younger than you; (3) avoid or withdraw from people you know, or is overly anxious or fearful meting new people or trying new experiences; (4) difficulty playing games or sports with rules; (5) difficulty communicating with others; e.g. able to use verbal and nonverbal skills to express self, carry on conversation, or ask for assistance; and (6) difficulty speaking intelligibly or with adequate fluency. 20 CFR §416.926a(i)(3).

problematic because the record does not support a finding M.A.J's mental health problems were "inconsistently managed." (Tr. 26.) Indeed, M.A.J. entered treatment with Ohio Guidestone in October 2015. (Tr. 305.) She consistently attended counseling and therapy sessions throughout 2016 and 2017, often attending several times a week. (Tr. 354-378, 335-340, 411-416.) From April 2016 through July 2017, not a month went by where M.A.J. had not obtained some sort of mental health treatment through Ohio Guidestone. Moreover, while M.A.J.'s mother understandably had some hesitations about placing her school-age child on psychotropic medications and did not administer a few dosages of Zoloft in May 2016, she overall complied with M.A.J.'s prescribed medication regimen. (Tr. 293, 378.)

The Court acknowledges M.A.J. did not see a prescribing source from Ohio Guidestone between May 2016 and May 2017 and was off of her medications for a short period. (Tr. 378, 400.) In December 2016, M.A.J. experienced an uptick in symptoms after being off medications for three weeks "due to a change in psychiatrist at Guidestone." (Tr. 320.) Thus, M.A.J.'s brief noncompliance was not due to her mother's failure to "administer[] the claimant's psychotropic medication consistently." (Tr. 26.) Moreover, while it is unclear when M.A.J. resumed her medications after her three-week gap in December 2016, a May 2017 treatment note indicates she was back on her medications. (Tr. 400.) Therefore, M.A.J. was not on her prescribed medications for no more than six months during the relevant period. Morever, despite the ALJ's selective review of the record to support his assertion M.A.J. improved "significantly" when she returned to Ohio Guidestone for pharmacological management, treatment notes in May and July 2017 indicate M.A.J continued to be defiant, struggled to communicate effectively with adults, and presented with poor hygiene and a blunted affect. (Tr. 399, 425.)

The ALJ also attempted to discredit Dr. Block's testimony by citing to counseling records in which M.A.J. purportedly had "gradual improvement" in her symptoms. (Tr. 26.) In support of this assertion, the ALJ provided little more than exhibit numbers to several of M.A.J.'s therapy sessions. (*Id*.) The ALJ did not specify what information contained in these records he used to support his findings, nor did he provide any discussion of the contents of these therapy sessions at an earlier point in the decision. A review of these exhibits reveal some evidence which is inconsistent with the conclusion of the ALJ, including M.A.J. having difficulty managing her symptoms outside of her therapy sessions, continued defiance towards her teachers, having "bad" days emotionally, and difficulty managing her anger and self control. (Tr. 364, 376, 377.) Moreover, the ALJ does not acknowledge the fact that despite all these "improvements" in M.A.J.'s condition, she still required therapy sessions several times a week in order to cope with her mental impairments.

The Court finds the ALJ engaged in a selective review of the record – noting only the portion of the records which would support his finding Dr. Block's testimony should be accorded little weight in the domain of interacting and relating with others. Indeed, the ALJ did not provide a meaningful discussion of M.A.J's rather voluminous counseling records, instead simply stating the evidence revealed non-compliance, inconsistent treatment, and "gradual improvement." (Tr. 26.) Within this very brief discussion of the medical evidence, the ALJ does not acknowledge or address several key pieces of evidence in the decision, including (1) any of M.A.J.'s report cards; (2) her 504 plan and related accommodations; (3) in-school academic testing; and (4) M.A.J.'s December 2016 emergency room visit, during which she endorsed

suicidal ideation and verbal abuse from fellow students and her sister.  (Tr. 320, 218, 220-221, 226-227, 224-225.)

While the ALJ is not expected to discuss or cite every piece of evidence contained in the medical record in this case, the amount of educational records, academic testing, and mental health treatment notes the ALJ did not discuss or analyze is alarming.  This undercuts his reasoning Dr. Block's opinion was inconsistent with the "medical evidence as a whole."  (Tr. 26.)

The Court acknowledges an ALJ was not required to provide "good reasons" when evaluating the testimony of a non-examining medical expert, such as Dr. Block.  *See Larkin v. Berryhill*, 2018 WL 2068295, *23 (N.D. Ohio Apr. 11, 2018).  However, due to the ALJ's inaccurate depiction of M.A.J.'s treatment course, combined with his failure to thoroughly discuss the medical evidence in the decision, the Court finds the ALJ's analysis of Dr. Block's insufficient and not supported by substantial evidence.

Accordingly, the Court finds remand is necessary to allow the ALJ an opportunity to properly conduct an analysis of the ME's testimony and the evidence surrounding M.A.J.'s ability to interact and relate with others.

Finally, as this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Plaintiff's remaining[12] assignments of error.

---

[12]    Plaintiff's other assignments of error relate to the ALJ's (1) evaluation of the opinions of the consultative examiners and (2) the evaluation of the reports of M.A.J.'s teachers, therapists, and the state agency physicians.  (Doc. No. 14 at 21-25.)  As detailed above, the Court has concerns regarding the ALJ's treatment of Dr. Blocks's opinion, his failure to admit an important treatment note, and the rather cursory review of M.A.J.'s records.  On remand, the ALJ should carefully consider all of the opinions and reports contained in the record and also should

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED and

REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**

 _s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 1, 2019

---

conduct a more thorough review of the evidence.